# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LOIS HACKMAN o/b/o Edward Hackman )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 04 C 0169<br><br>Magistrate Judge Nan R. Nolan |

## MEMORANDUM OPINION AND ORDER

This case is a review of the final decision of the Commissioner of Social Security, defendant Jo Anne Barnhart, who denied the claim of Edward Hackman ("Hackman") for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d), 1382(c). The plaintiff, Lois Hackman[1] ("Plaintiff"), seeks judicial review of this decision in federal court pursuant to Sections 405(g) and 1383(c) of the Act, which grant federal courts the power to review the Social Security Commissioner's final decisions. Cross motions for summary judgment are pending. For the reasons set forth below, the Court grants Plaintiff's Motion for Summary Judgment or Remand [19-1], denies Defendant's Motion for Summary Judgment [23-1], and remands the case back to the ALJ for further proceedings consistent with this Opinion.

## PROCEDURAL HISTORY

Hackman filed an application for Disability Insurance Benefits and Supplemental Security Income benefits on August 15, 2000, seeking a period of disability as of July 5, 2000. (R. 20, 138). His application was denied initially as well as on reconsideration. (R. 68-75; 78-80). Hackman timely filed a request for a hearing, and one was held before Administrative Law Judge ("ALJ") Maren Dougherty on June 12, 2002. (R. 26-67; 81-85). Hackman, represented by counsel, testified

---

[1]Mr. Hackman died on July 19, 2002. The immediate cause of death listed on his certificate is sepsis as a consequence of DIC and shock of sepsis. (R. 270). His mother, Lois Hackman, has been substituted as the plaintiff in this action. Accordingly, all references in this Opinion to "Plaintiff" shall mean Lois Hackman.

at the hearing along with vocational expert Christopher Yep and Hackman's niece, Jessica Somers. (R. 26-67). In a written decision dated June 28, 2002, ALJ Dougherty denied Hackman's claim, finding him not disabled as defined under the Act. (R. 20-25). Hackman then sought review of the decision with the Appeals Council, which denied his request on November 26, 2003. (R. 10-12). Accordingly, the decision of ALJ Dougherty became the final decision of the Commissioner of Social Security. 20 C.F.R. §§ 404.981, 416.1481, 422.210(a).

## FACTUAL BACKGROUND

A.   Medical Evidence

On June 17, 1998, Hackman sought treatment at the emergency room of Centegra Memorial Medical Center due to pain in his left knee of two days duration. (R. 220). Dr. Anoop Karna, M.D. performed a physical examination and noted that Hackman had "marked exogenous obesity" and "significant tenderness on the inferior lateral aspect of the patella." Id. Dr. Karna found no limitation of movement and Hackman's left knee x-rays were negative. Id. Dr. Karna opined that Hackman's left knee pain "certainly could be due to arthritis and strain from his marked exogenous obesity." (R. 220). He was given a knee immobilizer, as well as a prescription for Anaprox. (R. 220).

On November 13, 1999, Hackman sought emergency care at Sherman Health Systems for a swollen left leg with a rash. (R. 231). Hackman reported that his problem began after lifting heavy x-ray equipment three days earlier. Id. He was assessed as having deep venous thrombosis of the left leg and was sent to the Illinois Medical Center emergency room for further evaluation. Id. At the Northern Illinois Medical Center, Mukesh Arora, M.D., reported finding "+1 edema, ecchymosis with purpuric rash all the way up to the thighs" and "chronic venous stasis on the left leg." (R. 188). Dr. Arora opined that Hackman had cellulitis and purpuric rash and started him on Ancef. (R. 189). Dr. Arora saw Hackman again on December 3, 1999, at which time he noted Hackman should continue with his medication for cellulitis. (R. 225).

On September 29, 2000, Dr. Arora reported a diagnosis for Hackman of low back pain, edema, and obesity. (R. 197). Dr. Arora noted that Hackman had bone destruction in his knees, which he reported was an abnormality due to osteoarthritis and obesity. Id. Dr. Arora further noted that Hackman reported "constant pain." Id. He also noted that Hackman's ability to handle gross manipulation was limited and his fine manipulation with either hand was unlimited. Dr. Arora noted that Hackman was able to ambulate normally. (R. 198). Finally, Dr. Arora averred that Hackman had chronic venous insufficiency with stasis dermatitis and pitting edema. (R. 199).

On December 5, 2000, Gurbax Singh Saini, M.D., examined Hackman. He found no evidence of redness, effusion or swelling of any joints of the extremities but did note stasis dermatitis changes in both of Hackman's lower legs from obesity, as well as swelling and cellulitis. (R. 202). Dr. Saini noted that Hackman's ability to bear weight was normal, his gait was slightly wide because of his obesity, and he did not need any assistive device. (R. 203). Dr. Saini reported a diagnostic impression of morbid obesity and osteoarthritis in the knees. Id.

On December 27, 2000, state agency medical reviewer E.C. Bone, M.D., reviewed the medical evidence in Hackman's file and completed a Physical Residual Functional Capacity Assessment. (R. 208-15). Dr. Bone indicated that Hackman could lift and carry up to twenty pounds frequently and ten pounds occasionally and could sit, stand or walk up to six hours each during an eight hour workday. (R. 209). He further found that Hackman's ability to push and pull with his lower extremities was limited. Id. Hackman could occasionally climb ladders, ropes, and scaffolding, and occasionally balance, stoop, kneel, crouch, and crawl. (R. 210). Further, Dr. Bone opined that Hackman could frequently climb ramps and stairs. Id.

Dr. Arora saw Hackman again on February 8, 2001, at which time he wrote on a prescription note that Hackman needed to keep his legs elevated while seated. (R. 165, 226). The prescription note does not appear to indicate the duration of time Hackman needed to keep his feet elevated, but a part of the note is illegible. Thereafter, on October 9, 2001, Dr. Arora completed a Physical Capabilities Evaluation in which he reported the following limitations for Hackman: (1) could lift

as much as eight to ten pounds, but only two to three pounds frequently; (2) could stand and/or walk for two to three hours in an eight hour day, with one-and-a-quarter hours being uninterrupted; (3) sitting is not affected; (4) push/pull is limited; (5) could never climb but could occasionally balance, stoop, crouch, kneel, crawl, and operate foot controls; (6) could only occasionally reach above shoulder level bilaterally; and (7) could frequently perform gross and fine manipulations. (R. 243-45). On October 9, 2001, Dr. Arora completed an Obesity Report for which he gave a current diagnosis of morbid obesity, reporting Hackman at 5'10" and 300 lbs. (R. 249). Dr. Arora noted that Hackman had joint pain and edema, for which he recommended exercise. (R. 250). Finally, on November 8, 2001, Dr. Arora completed a Sit/Stand Interrogatory and reported that Hackman needed to elevate his legs every one to two hours due to edema, cellulites and arthritis. (R. 254). Dr. Arora's finding as to "how long" Hackman needs to elevate his legs every one to two hours is illegible. Id.

B.      Hackman's Testimony

At the time of the June 12, 2002 hearing before the ALJ, Hackman was a forty-seven year old man who stood 5'10" tall and weighed approximately 360 lbs. (R. 38) He had an eleventh grade education (R. 149), and had worked as a driver between approximately 1988 and July 2000. (R. 144). Hackman testified that he stopped working on July 5, 2000, as the result of bilateral knee pain that prevented him from being able to climb up and down his truck, lift or carry heavy things, and bend over far enough to pick up heavy objects. (R. 31-32; 143). He stated that pain in both of his knees was his worse impairment. (R. 31-32). His knees hurt when he walks or stands up, and he "once in a while" gets a sharp pain when seated. (R. 32-33). He testified he can only walk thirty yards before he has to stop and sit due to the burning pain in his knees and that he usually needs to sit for about five to ten minutes before the pain goes away. (R. 33). The knee pain also occurs when he has to stand in one spot for more than five minutes. (R. 34) In June of 1998, Hackman had an x-ray taken of his left knee that came back negative. (R. 46). His knees have not been x-rayed since that time. (R. 46, 220).

Hackman explained he has back pain that manifests when he walks and once in a while when he has to bend over. (R. 33-34). The pain in his back is toward the spine and down into his hip, and he is usually only able to walk 30 yards before the pain begins. (R. 34). The back pain occurs every time he walks and when he has to stand still in one place for more than five minutes. Id. Hackman further testified to swelling episodes in his hands and ankles. (R. 34-36). As to his hands, Hackman said he cannot carry things far or his hands fall asleep and knuckles swell. (R. 34). The swelling is affected by the weather, with cold and damp weather making it such that he cannot close his hands all the way. (R. 35). His ankles also swell and this makes them stiff when he walks. (R. 36). He has problems rising from a seated position and thereafter gaining his balance. (R. 39). Hackman also stated that he elevates his legs to hip level at home by sitting in a recliner (R. 36), that he spends three to five hours per day in the recliner (R. 37), and that this is a comfortable position for him. (R. 37).

When asked about prescription medications, Hackman replied that he is supposed to take several but does not have the money to do so. (R. 37). He was not taking any pain medications as of the date of the hearing but had taken them in the past. (R. 41). When he did take his prescribed medications, Lasix helped reduce his edema by bringing down the swelling to the extent that some days he was able to bend over and tie his shoes. (R. 37, 40). He used to take Vicoprofen and Darvocet, which he said dulled the pain and allowed him to walk a little bit farther and stand a little bit longer. (R. 41). Celebrex made him swell more, and the prescription pain medications made him drowsy, sleep more, and affected his concentration. (R. 41-42). When asked by the ALJ whether he took any over the counter medications for his problems, Hackman replied that he takes Tylenol, "[o]nce every couple of weeks when I get real dull bad pain." (R. 45). The Tylenol "helps a little bit" and makes him "a little more mobile . . . ." Id.

Hackman lived by himself the summer before the hearing. (R. 46-47). Three months prior to the hearing, he began living with his niece, her baby and his brother. (R. 38, 47). He stated his niece and brother "will wrap my legs with Ace bandages" and "help me get my shoes on, do my

laundry, take me places I need to go." (R. 38). Hackman helps around the house by putting the dishes in the dishwasher and mopping. (R. 43-44). Each activity takes about five minutes. Id. Hackman is able to watch television, read the Bible, and enjoys doing crossword puzzles. (R. 43). Hackman further testified that he does not do any activities outside of the house. (R. 44).

Hackman said he is unable to drive because ". . . I can't bend my knee far enough to push the clutch . . . ." (R. 49). He drives "maybe twice a week" and when he drives he stays within eight miles of his home, not leaving the Woodstock/McHenry area. Id. When asked why he feels confined to this area, Hackman replied: "[t]he gas, no money for gas." Id. Hackman said he tries to shop for groceries, but that he has no money to buy them. (R. 49-50).

C.     Jessica Somer's Testimony

Hackman's live-in niece, Jessica Somers ("Somers"), also testified at the hearing. (R. 59-65). Somers said over the last couple of years she had noticed that Hackman could not perform his daily activities and was "always in pain." (R. 59-60). She said she helps put on his socks and shoes, puts braces on his legs, goes to the store for him, and does other "normal stuff that any of us can do that he can't do." (R. 60). Somers has problems getting Hackman's shoes on sometimes because of the swelling. (R. 61). She said Hackman's most comfortable position is "[i]n his recliner with his feet up." Id. Somers testified that Hackman is depressed "a lot of the times." (R. 62). She said Hackman had not taken any medication to her knowledge during the three months he had been living with her. (R. 62-63).

The ALJ questioned Somers regarding the extent to which Hackman cares for her 7 month old child. (R. 64-65). Somers said that it is hard for Hackman to bend over and pick the child up, and that "[w]e either have [the child] in his walker where it's not bending close to the floor or we put [the child] in [Hackman's] arms before I leave..." (R. 64). Upon further questioning by the ALJ, Somers indicated that she works 40 hours per week and that Hackman was the primary babysitter while she is at work. (R. 64-65). Somers said she feels comfortable with how Hackman was managing the baby, and that they never lay the baby on the floor "[b]ecause we know he cannot

bend over and pick him up physically. But other than that, he does okay." (R. 65).

D.      Vocational Expert's Testimony

At the hearing, vocational expert Christopher Yep (the "VE") testified that Hackman's past work as a driver was semi-skilled and heavy in exertion. (R. 52). The ALJ asked the VE to assume someone of Hackman's age, education and work experience, with the following limitations: (1) can lift as much as eight to ten pounds, but only two to three pounds frequently; (2) can stand or walk for two to three hours in an eight hour day, with one-and-a-quarter hours being uninterrupted; (3) sitting is not affected; (4) push/pull is limited; (5) can never climb but can occasionally balance, stoop, crouch, kneel, crawl, and operate foot controls; (6) is not able to bend to the floor; (7) can only occasionally reach above shoulder level bilaterally; and, (8) can frequently perform hand and finger manipulations. (R. 52-53). With these limitations in mind, the VE testified that such a person could work as a telephone quotation clerk (43,186 jobs) and sorter (9,783 jobs) in the State of Illinois. (R. 53). The ALJ then asked the VE to assume this person also needed to elevate his legs every one to two hours for a "few minutes" to hip height. Id. The VE testified that such a limitation would reduce the number of cited telephone quotation clerk jobs by half but would leave the number of available sorting positions unchanged. (R. 53-54). The VE further stated that if a person had to elevate his legs higher than hip level and be in a more reclined position, the person would be unable to attend to task. (R. 55).

The VE testified that both jobs are sedentary[2] and that the residual functional capacity assessments he was given were consistent with how the jobs are cited in *The Dictionary of Occupational Titles*. (R. 55). The VE gave the DOT numbers of the jobs and said the SVP was 2 for both jobs. (R. 56). He said a telephone quotation clerk job would entail sitting at a desk and

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or caring articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." See 20 C.F.R. §§ 404.1567(a), 416.967(a).

making phone calls to provide or solicit information. (R. 56-57). Both the telephone job and the sorter job would require use of the hands to dial. (R. 66).

The ALJ then modified the above hypothetical to restrict the person as follows: (1) can walk only about 100 feet; (2) sit/stand for five minutes at a time; and, (3) can perform only occasional repetitive manipulations with hands. (R. 55). The VE testified that such limitations would eliminate both jobs "because both jobs would require the use of the hands on more then an occasional basis." Id.

## **STANDARD OF REVIEW**

In reviewing the final decision of the Commissioner, this Court must accept as conclusive the findings of fact made by the ALJ if they are supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972). If the record contains such support, this Court must affirm the decision of the Commissioner unless she has made an error of law. Veal v. Bowen, 833 F.2d 693, 696 (7th Cir. 1987). A reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). Nor may this Court reconsider credibility determinations made by the ALJ. Prince v. Sullivan, 933 F.2d 598, 601-02 (7th Cir. 1991). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ). Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987) (citations omitted).

## **ANALYSIS**

The Act defines disability as an inability to engage in substantial gainful activity due to a medically determinable impairment which can be expected to result in death, or which has lasted or can be expected to last for 12 consecutive months. 42 U.S.C. 423(d)(1)(A), 1382c(a)(3)(A); Steward v. Bowen, 858 F.2d 1295, 1297 (7th Cir. 1988). In addition, an individual is considered disabled only if he is unable to perform any of his previous work or any other work existing in

significant numbers in the national economy. 42 U.S.C. 423(d)(2)(A); 20 C.F.R. § 416.905. In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). Under this five-step analysis, "[a]n affirmative answer leads to either the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985) (citing 20 C.F.R. § 404.1520).

In applying the five-step analysis, ALJ Dougherty first determined that there was no evidence Hackman had engaged in substantial gainful activity after the alleged onset date (step 1). (R. 21). Next, the ALJ determined that Hackman's combination of impairments severely limited his ability to perform basic work activities (step 2). Id. At step three, the ALJ found that Hackman did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1. Id. At step four, the ALJ found that Hackman's impairments and RFC precluded him from performing his past job as a driver. (R. 23). Finally, the ALJ determined that Hackman retained the residual functional capacity to perform a limited range of sedentary work and combined with his age, education and work experience was not disabled (step five). Id.

Plaintiff argues that the ALJ's determination that Hackman was capable of performing limited sedentary work is not supported by substantial evidence. She makes three main arguments in support of her claim: (1) the ALJ in erred in finding that Hackman could perform sedentary work

because the ALJ failed to properly consider Hackman's impairments and their effect on his ability to work; (2) the ALJ failed to perform a proper credibility analysis; and (3) the ALJ improperly relied upon testimony from the VE which was not based on substantial evidence, and as a consequence, the Commissioner failed to prove a significant number of jobs exist in the national economy that Hackman can perform. As part of her first argument, plaintiff points out that the record does not support the ALJ's RFC finding regarding how long Hackman needs to elevate his legs every one to two hours. The Court agrees that the ALJ's determination of this portion of Hackman's RFC is problematic.

The ALJ must build "an accurate and logical bridge from the evidence to his conclusion." Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003). Here, the ALJ did not set forth an accurate picture of the evidence relating to Hackman's need to elevate his legs. The ALJ found that Hackman "needs to elevate his legs to hip level every one to two hours for a few minutes." (R. 21). The record contains no evidence supporting the ALJ's finding that Hackman needed to elevate his legs "for a few minutes" every 1 to 2 hours. The only explanation given for the ALJ's conclusion is her statement that "the residual functional capacity contained herein mirrors that provided by claimant's treating doctor (Exhibit 10F), including the need to elevate the legs every 1 to 2 hours (Exhibit 11F)." (R. 22-23). This statement is not accurate. Nowhere in the record does Dr. Arora state that Hackman needed only to elevate his legs "for a few minutes" every 1 to 2 hours.

The primary evidence on this issue is contained in a prescription note from Dr. Arora dated February 8, 2001 (R. 226) and a Sit/Stand Interrogatory completed by Dr. Arora on November 8, 2001 (R. 254). In the February 2001 prescription, Dr. Arora indicated Hackman needed to "keep his legs elevated while sitting," which suggests an amount of time much greater than "a few minutes" every 1-2 hours. In the November 2001 Sit/Stand Interrogatory, Dr. Arora indicated that Hackman needed to elevate his legs "every 1 to 2 hours;" however, the duration of time Hackman

was to elevate is illegible.[3]  In any event, there is nothing in the record to suggest that Hackman needed to elevate his legs "for a few minutes."

Instead of inventing facts, the ALJ should have recontacted Hackman's treating physician, Dr. Mukesh Arora, to obtain information regarding the duration of time Hackman needed to elevate his legs every one to two hours.  "An ALJ has an obligation to develop a full and fair record." Howell v. Sullivan, 950 F.2d 343, 348 (7th Cir. 1991).  Title 20 C.F.R. § 404.1512(e) instructs the ALJ to recontact a claimant's treating physician when his opinion "contains a conflict or ambiguity that must be resolved [or] the report does not contain all the necessary information . . . ."  While there is no doubt that Dr. Arora diagnosed Hackman as having edema which necessitated the elevation of his legs, the medical records provided by Dr. Arora are at times illegible and leave a gap concerning how long Hackman need to elevate his legs at the one to two hour intervals.  The ALJ did not recontact Dr. Arora to ascertain the missing information.  Rather, the ALJ impermissibly made her own conclusion regarding the duration and ultimately found that Hackman "needs to elevate his legs to hip height every 1-2 hours *for a few minutes*." (emphasis added); Blakes, 331 F.3d at 570 (holding an ALJ improperly "play[s] doctor" when she makes a medical conclusion without expert evidence).  There is nothing in the record, either in the form of medical evidence or testimony, to suggest that Hackman needed to elevate his legs "for a few minutes" every 1 to 2

---

[3] Of course, the parties disagree over the illegible writing.  Plaintiff believes that Dr. Arora was indicating Hackman needed to elevate his legs "as needed."  Pl's Memo. at 11.  Defendant contends that the "ALJ's derivation of the doctor's November 2001 averment into her RFC finding is supported by the record."  Def's Memo. at 7.  The Commissioner also says that "beyond evidence from Dr. Arora, the ALJ's RFC finding is also supported by medical consultant opinion evidence, which endorses that Plaintiff could perform at least a limited range of sedentary work."  Id.  The Commissioner's argument is without merit.  First, the record does not support the Commissioner's claim that ALJ's RFC finding included Dr. Arora's November 2001 averment because Dr. Arora's opinion regarding "how long" Hackman needed to elevate his legs is illegible.  (R. 254).  Second, the ALJ did not rely on the medical consultant opinion evidence to support her RFC finding but rather claimed that it "mirrors that provided by claimant's treating doctor."  (R. 22).  See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) (stating "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

hours. The ALJ erred when she failed to recontact Dr. Arora to request information as to how long Hackman needed to elevate his legs every one to two hours.

The ALJ's error was not harmless. Correction of the factual error could lead to a finding that Hackman needed to elevate his legs significantly longer than "a few minutes" every one to two hours. Hackman's RFC may be quite different with the missing information. For example, Hackman testified he spent three to five hours per day in a recliner with his feet elevated and that this was a comfortable position for him. (R. 37). Hackman's niece also offered testimony that Hackman was most comfortable "[i]n his recliner with his feet up." (R. 61). The VE testified that there would be a limit as to the amount of time a person could work with his feet elevated and in a reclined position. (R. 54-55). The VE testified that both the telephone quotation clerk and sorter position would be eliminated if a person had to sit as Hackman described he had to sit in a recliner in a reclined position such that he could not sit forward and attend to task. (R. 58). Without medical evidence as to the duration of time Hackman needed to elevate his legs every one to two hours, the ALJ's RFC determination is not supported by substantial evidence and a remand is warranted.

As a result of the Court's decision to remand this case on the foregoing basis, the Court need not address Hackman's arguments regarding the ALJ's credibility analysis and her reliance on the VE's testimony. However, the Court is troubled by some of the ALJ's credibility findings and offers the following observations in order to provide guidance on remand. First, the ALJ's credibility determination in this case rested in part on the "*notable* . . . fact, that according to his niece, the claimant is the primary caregiver for her 7 month old infant as she is employed full time." (R. 22) (emphasis added). In a recent opinion, the Seventh Circuit Court of Appeals held that the administrative law judge's "casual equating of household work to work in the labor market [could not] stand." Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005). Writing for the court, Judge Posner emphasized that "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not. You can park the infant in a playpen for much of the day, and

anyway it will sleep much of the day (on average about 2 to 4 hours), and so the caretaker will have numerous breaks in which to rest." Id. at 867-68.[4] On remand, the ALJ should consider the rulings set forth in Gentle.

Second, in finding Hackman's complaints of disabling symptoms and limitations not "entirely credible," the ALJ noted that Hackman's attorney "reports (perhaps inadvertently) that claimant left his job in July 2000 *because* the company closed." (R. 22, 24) (emphasis added). The ALJ misrepresents Hackman's counsel statement, which actually says that Hackman "has not worked since July 5, 2000 when the company closed." (R. 176). Moreover, Hackman testified that he stopped working because he could no longer perform his job. (R. 31).

Third, the ALJ stated that "up until a year ago [June 2001], claimant lived independently in a travel trailer while his sister was renting a spot for it in a trailer park." (R. 22). The ALJ's statement is not an accurate report of Hackman's testimony and is misleading in implying that Hackman lived alone with no assistance from others. Hackman testified that he lived in the trailer on the spot his sister rented during the summer 2001 through September 2001. (R. 47). Immediately prior to that, he lived with his mother and sister and then another niece. Id. Although Hackman lived alone during the summer of 2001, the evidence show that he did so with the assistance of his mother and sister who did his laundry and grocery shopping and neighbors who took care of mowing the grass. (R. 47-49). See Elbert v. Barnhart, 335 F.Supp.3d 892 (E.D. Wis. 2004).(stating "[i]t is true that plaintiff lives by herself, but the evidence showed that she got by only with the assistance of her son and her landlord, who shopped for her, paid her bills, bought her food, and helped out around the house. This sort of assisted living arrangement is not inconsistent with disability.").

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment or Remand is

---

[4] The Gentle opinion also provides a good discussion of the importance of considering a claimant's disabilities in combination as well as the impact obesity has on those disabilities. Gentle, 430 F.3d at 868-69.

granted, and the Commissioner's Motion for Summary Judgment is denied. Pursuant to sentence four of 42 U.S.C. 405(g), the ALJ's decision is reversed and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter final judgment in favor of the Plaintiff and against the Commissioner in accordance with Rule 58 of the Federal Rules of Civil Procedure. Given the above deficiencies in the ALJ's credibility analysis, this Court suggests that the Social Security Administration transfer the case to a different ALJ on remand to ensure a fair review of the evidence in the record. See Sarchet, 78 F.3d at 309.

ENTER:

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: February 16, 2006**